[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties are before the court for a dissolution of their marriage of twenty-five (25) years. The plaintiff wife initiated the action and the defendant husband brought a cross-complaint thereafter. They are the parents of two (2) daughters — Liliana, who is presently twenty-three (23), and Melisa, who is twenty (20).[1] The husband is forty-nine (49) and the wife is forty-eight (48). As a result of an automobile accident approximately eight (8) months ago, the wife sustained injuries to her neck and back for which she continues to treat weekly; she is otherwise in good health as is the husband. The case was tried over two (2) days (April 3 and 4, 2001) and both parties were effectively represented by counsel. Each party testified and the court observed their demeanor and evaluated their credibility. An additional witness testified and numerous exhibits, most of which consisted of personal and corporate tax returns and real estate documents and banking CT Page 5410 records, were introduced. Each submitted a sworn financial affidavit and claims for relief.
At trial, the husband renewed his Motion for Modification regarding the March 25, 1999, pendente lite order (Cutsumpas, J.) requiring him to pay all bills referable to the marital premises. He claimed therein his wife had obtained full-time employment and there was therefore a substantial change of circumstances which should require her to financially contribute to those obligations. This court denied that motion (no. 120) on April 11, 2001.
Both parties were born in Italy; each received a high school education there (which education each testified was the functional equivalent of an eighth grade education here). The husband came to this country in 1970; he has had a plumbing and heating license for approximately fifteen (15) years. He speaks and understands English well, owns and runs a plumbing and heating business, keeps the records of that business, issues payroll checks, pays the business expenses, and operates a computer. The wife came here in 1974, speaks English though less fluently than does her husband, has difficulty reading English, and cannot type or do math or operate a computer. They married in Bridgeport on April 10, 1976. For a period of time immediately following the marriage, she worked as a "sewer." Once they started a family, they agreed she would not work outside the home but would instead be a full-time homemaker and caretaker for the children while he would be the financial provider.
In 1975, he became a partner with two (2) others (one [1] of whom is a silent partner) in Ideal Plumbing and Heating Construction Company, Inc. (hereinafter "Ideal") located at 560 James Street in Bridgeport. In 1987, he purchased the interest of Sam DiDomenico, the other 50% shareholder, for $267,700 (plaintiff's exhibit A) of that amount, $107,700 was paid in cash and the remainder ($160,000) was financed by a mortgage covering the business situs, 502 James Street in Bridgeport, the adjoining property owned by the husband, and 80 Woodlawn Road in Monroe, the couple's marital home.[2]
The husband has an ownership interest in multiple properties as follows:
1. 80 Woodlawn Road, Monroe, Connecticut
 This is the marital property in the couple's name. There is a first mortgage held by First Union in the approximate amount of $18,000. The second mortgage secured the husband's purchase of the business he now entirely owns and is now currently in the approximate amount of $91,626.60. The wife testified it was without her consent that the CT Page 5411 marital home secured that purchase.
2. 281 Godfrey Road, Fairfield, Connecticut
 The husband's parents purchased this home in 1996 for $179,000. The husband contributed $40,000 as against his business. Its current appraised value is $170,000. The husband testified the $40,000 was a "loan" to his father though he required no note from the gentleman. As proof of the "loan", the husband offered a copy of a wire transfer from Italy to him (defendant's exhibit 2). The transfer was prior to the initiation of this action and for "19,073.500", which he testified was $11,107.30 and which went into his and the wife's checking account. The court cannot find either that the amount was a "loan" or that the father wired the amount to the husband since the exhibit made no reference to the father or referenced any loan.
3. 48-50 Benham Avenue, Bridgeport, Connecticut
 This is a three-family rental property the husband owns in survivorship with his father, each having equal ownership. Both this couple and his parents lived there before buying their present homes. The property was purchased before this marriage for $48,000. The first floor rent of $600 per month ($7,200 per year) is retained by the father; this husband keeps the second floor rent of $575 per month ($6,900 per year). After payment of expenses, the father and son equally split the remainder of the third floor rent. Despite his financial affidavit showing the expenses for this property (taxes, water, insurance, etc.), the husband's trial testimony was that his father paid some of those expenses.
4. 502-560 James Street, Bridgeport, Connecticut
 These are two (2) adjoining pieces of property owned by Ideal. 502 James Street is a rental property with income of $925 per month ($11,100 per year) to the business. Ideal conducts its business at 560 James Street. Despite having the rental income from 502 James Street, the business showed no such income on either the 1998 or 1999 corporate return (Neither the 2000 personal or corporate return has yet been filed.). See plaintiff's exhibits G and F. That rental income goes into the husband's personal checking account. The present value of 502 James Street is $53,000 and there is a current mortgage balance of $2,632.07. The present value of 560 James Street is $140,000 and the principal balance as of February 9, 2001, is $37,947.34 (defendant's exhibit 7). Ideal pays the mortgages on 502 James Street, 560 James Street, and the balance still due and owing Sam DiDomenico from the husband's purchase of the company. CT Page 5412
The husband testified he had gross income of $560 per week from Ideal and his net weekly income was $480. The exhibits show said checks to him each week for $560. Ideal owns a 1991 Chevy Blazer the husband uses for personal use (It also owns a 1992 Astro van and a 1996 Dodge van and three "inoperable" trucks; there is no outstanding loan on any vehicle.). A significant number of additional checks were issued to him from the business in the same amount of $560. He testified these were not paychecks but pay backs of "loans" he had made to the corporation though he stated he had "no idea" how much he had loaned the corporation over the years. Though the memo section of these checks reference "loans," there is no documentary evidence of the gentleman having made any such loans to the company. The court therefore finds his testimony regarding "loans" to be untruthful and finds his undeclared income to be significantly greater than reported. For example, in the three week period from August 4 — August 24, 2000, he issued such checks to himself in the amount of $2,580 (plaintiff's exhibit M); in the three week period from September 1 — September 22, 2000, he issued himself checks in the sum of $1,680 (plaintiff's exhibit N); from October 20 — October 27, 2000, he wrote himself checks totaling $1,680 (plaintiff's exhibit O). Additionally, income from the business was used to pay $3,500 for a car for one daughter and $8,000 for a car for another (Of interest is that both cars were put in his wife's name as opposed to his own despite his company's contribution to each purchase.). Various business checks were made out to "cash." Ideal checks were used to pay some of his attorney's fees (to one attorney who represented him regarding DWT charges and to another for this dissolution), his personal and business accountant (Santiago Morales), Fairfield University tuition fees for a daughter, a daughter's computer equipment, a mobile phone, etc. On February 24, 1999 (post this action), he wrote his father a check for $25,000 (check no. 3537 — plaintiff's exhibit I), which check bore the memo "loan paid back" though he had earlier testified at deposition he owed his father no money (arguably true given the timing) and although in violation of the automatic orders. He sometimes paid household bills (as ordered pendente lite) from business income (check no. 3515 — plaintiff's exhibit I). The conclusion is inescapable that "income" to him was greater than that to which he testified and that he freely mixed income from the corporation and his personal earnings without any indication of such on his tax returns. He also stated his father sometimes did work for the business for which the father was paid but he never issued the father a W2 or 1099.
His 1999 personal tax return (defendant's exhibit 3) showed wages of $27,558 to him. Plaintiff's exhibit P showed income to him from employment to be $31,200 though he claimed that to be computer error" (He issued the paychecks and operated the computer.). Ideal's primary CT Page 5413 customer was Bridgeport Hydraulic Company (BHC); he testified 85% of the business income was from BHC. Yet Maria Fanell of BHC produced records of payment by BHC to Ideal in 1999 in the amount of $200,061.70 (plaintiff's exhibit R) — this despite the 1999 corporate return (plaintiff's exhibit F) showing gross receipts of $206,370 (She also testified BHC payments to Ideal in 2000 were $171,344.30 — plaintiff's exhibit S.). His 1999 personal tax return declared rental income to him of $3,228; at trial, he admitted to receipt of $7,500 from 48-50 Benham Avenue alone. His 1998 personal return (plaintiff's exhibit C) showed his wages as $16,400 though wage stubs for that year showed income of $29,600 through October 2 (plaintiff's exhibit D). In 1998, he showed additional business income of $10,000. He first testified that was rental income but he later stated it was a "management fee" paid by Ideal. In fact there was testimony that he received rental income from garages at the Benham Street location though the court makes no finding in this regard. The 1999 corporate return (plaintiff's exhibit F) showed "officer compensation" of $27,558; at trial, he testified Fred Schwartz was an officer but that he received no income. That same return failed to show rental income of $11,100 from 502 James Street. It showed $123,169 as loans to "shareholders" (He is the only shareholder.). The 1998 corporate return was similarly questionable in that it too showed no income from 502 James Street and reported gross profits of $189,518 yet a net operating loss of $28,355. It claimed compensation to "officers" of $26,400 and wages of $22,140.[3] The wife also testified he took private jobs throughout the marriage, that they numbered fifteen — twenty (15 — 20) in the course of a year, and that he would be paid cash which he would put directly into a safe he kept at home. At trial, he testified he did some work for five or six other contractors but did not indicate how much he earned from those jobs, whether he was paid by cash or check, or whether the money was considered as income to Ideal.
Throughout the marriage, the husband loaned money to friends and relatives. He loaned a cousin, Louis Siconolfi, $18,000 which has never been paid back. He loaned another cousin, Tony Siconolfi, $5,000 after the dissolution had been commenced (also not paid back). Yet, he testified, he owed his sister Antoinnette Volderauer, $10,000 and produced a promissory note to her dated October 20, 2000 (defendant's exhibit 5), which demand note required him to pay 5% interest "together with any costs, disbursements, and reasonable attorney's fees. . . ." His trial testimony was also that he had borrowed $30,000 from his sister for attorney's fees (No note for this sum was offered.). His wife testified he paid back all he owed his sister ($10,000 she claimed) within six (6) months because he was determined not pay her any interest. The court rejects the testimony he presently owes his sister any amount as not credible. CT Page 5414
From 1997-1999, the husband failed to deduct proper withholding or to pay social security taxes. In 1999, he entered into a compromise agreement with the IRS, the terms of which obligated him to pay at the rate of $500 per month. The current balance due the IRS is something slightly in excess of $19,000 (This includes penalties and interest.). It is, however, telling that he testified to having paid only a portion of the taxes for 2000 and, to date, has not paid anything for 2001.
The wife is presently employed at the rate of $9.00 per hour as a security guard. She pays for her own medical insurance and pays $79.00 per week for that coverage. She receives no vacation, holiday, or sick pay. Since she works only when needed, she earns gross income anywhere from $216 per week to $387 per week and averages $300 per week. Her testimony was that she has never brought home as much as $300 per week. This past fall, she was involved in a car accident in which she asserted she injured her neck and back, for which injuries she continues to treat. She has incurred medical bills for continuing treatment; those bills remain unpaid because the coverage on the car she was driving had lapsed. She testified she twice forwarded the bills to her husband but that he failed to pay. He stated he never received the bills. The court finds her testimony more credible in view of her inability to pay the premiums and thus her interest in sending the bill to her husband. Additionally, she has incurred $15,600 in attorney's fees for this action, which amount remains unsatisfied for reason of her lack of funds.
As to the cause of the breakdown, the wife's testimony was that the husband, who had always been a good provider, had a drinking problem for many years, that he stayed out late and came home drunk, that he often slept or was otherwise irascible when at home, that he became critical of meals served, and was argumentative — all resulting in a deterioration of their personal relationship. She stated he had been arrested for DWI three (3) times over a ten year period and that his driving license was suspended thrice. She described one (1) occasion when, during an argument at home, the daughters called 911 and another occasion when she and the daughters responded to a call from police by going to pick him up after a DWI arrest and resulted in the husband later punching a daughter in the face. She described his inability to or disinterest in attending family events and recalled going to a wedding with the daughters without him. In her view, it was his drinking that caused the marital breakdown. Though he finally admitted to staying out after work and to doing some drinking, he testified he did nothing to contribute to the breakdown. He stated he had not had a drink in twenty-six months; thus he had been drinking immediately prior to the commencement of the action (When the dissolution was filed, he ordered the wife and daughters from the house; ultimately the husband left when CT Page 5415 the court entered a restraining order which forbade his return to the home.)
His view is that the marriage failed as a result of the wife spending time with Theresa DiDominico, who came here from Italy at the end of 1997. Ms. DiDomenico spent time at the marital home and she and the wife would sometimes go out for dinner. He resented the wife spending time away from the home, resented that the wife failed to report by telephone her whereabouts when away from the house, and resented that Theresa sided with the wife during family disagreements. of interest is that the husband paid 1998 taxes Theresa owed the City of Bridgeport.
Clearly, the husband's drinking made a significant contribution to the breakdown. It is also so, however, that the wife's exercise of personal freedom for the first time during this lengthy marriage and her desire to build a life outside the home and independent of her husband wrought a change in their relationship, which change he could not accept. The wife's activities were not inconsistent with a happy marriage had that marriage been healthy — particularly since both daughters were grown with their own work and school and social life and, thus, no longer dependent upon parental caretaking.
In formulating proper orders in this case, the court must consider the factors set forth in §§ 46b-81 and 46b-82, together with the provisions of § 46b-62 regarding attorney's fees. The court has considered all of these factors in making its determinations and has considered all of the evidence, the parties' demeanor and credibility, their financial affidavits, claims for relief, memoranda of law, and all of the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account," Scherr v. Scherr, 183 Conn. 366,368 (1981), this court will not recount those statutory criteria and the evidence other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria."Weiman v. Weiman, 188 Conn. 232, 234 (1982) The court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding, Lee v. Lee, 197 Conn. 1, 5 (1985); it need not give equal weight to each factor. Kane v. Parry, 24 Conn. App. 307,313-14 (1991) With specific regard to property assignment and what alimony award, if any, is appropriate, the court is mindful our alimony statute does not recognize an absolute right to alimony. General Statutes § 46b-82. Thomas v. Thomas, 159 Conn. 477, 487 (1970) As to alimony, it has been said, "The primary basis for the award of alimony has been not to punish . . . but to continue the duty to support the other. . . ."Toby v. Toby, 165 Conn. 742, 748 (1974). In making financial determinations, the financial circumstances, both actual and potential, CT Page 5416 are entitled to great weight. Valente v. Valente, 180 Conn. 528, 530
(1980). In Blake v. Blake, 207 Conn. 217, 230 (1988) our Supreme Court cited with approval the language of O'Neill v. O'Neill, 13 Conn. App. 300,311 (1988) regarding property division as follows:
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial efforts to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities. See also Watson v. Watson, 221 Conn. 698, 712 (1992)
The court has considered the issue of counsel fees as requested by the wife. Such fees are allowable under the provisions of § 46b-62 of the General Statutes. The wife's counsel has submitted an affidavit regarding financial services in the amount of $15,600 through trial. The wife has no liquid funds from which to pay this amount. The husband has significantly greater earning power and liquid assets, and he offered no evidence his attorney's fees remain unsatisfied.
The court, in addition to the foregoing, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the wife's complaint have been proved and are true.
3. There has been an irretrievable breakdown of the marriage.
4. The primary cause of the breakdown is the husband's drinking and his need to control the wife's activities so as to deny her free choice.
The court enters the following orders:
1. A dissolution of the marriage enters on the wife's complaint on the grounds of irretrievable breakdown of the marriage.
2. The husband shall pay periodic alimony to the wife in the amount of $575 per week. That obligation shall continue until there occurs the death of either party, the wife's remarriage, or her cohabitation as CT Page 5417 defined by statutory law.
3. The husband shall quitclaim all of his interest — subject only to the first mortgage — in the marital home located at 80 Woodlawn Road in Monroe, Connecticut, and it shall be hers free of any claim by the husband. She shall thereafter be responsible for payment of the first mortgsage, real property taxes, homeowner's insurance, and any other costs incident to her ownership. The husband shall be responsible for repayment of the second mortgage within five (5) years of the date of dissolution and shall provide the wife written proof of same within that time. Each shall indemnify and save harmless the other with regard to his/her respective obligations.
4. The husband shall retain any and all interest he presently has in real property located at 502 — 560 James Street in Bridgeport, Connecticut, 48-50 Benham Avenue in Bridgeport, Connecticut, and 281 Godfrey Road in Fairfield, Connecticut, free of any claim by the wife and he shall be responsible for any outstanding mortgage loans as he may now be together with whatever existing obligations there are regarding taxes, insurance, and any other costs in connection with the same. He shall indemnify and save harmless the wife from any liability in connection with those properties.
5. The husband shall be responsible for payments made the IRS with regard to taxes owed and any liabilities, interest, and/or penalties resulting from the filing of any joint or business returns filed with regard to any year in which the parties were married.
6. The husband shall pay to the law firm of Gans and Reynolds the sum of $15,600 within forty-five (45) days of this date in payment of the wife's counsel fees.
7. The husband shall continue to maintain life insurance in the sum of $155,400 and designate the wife as beneficiary for so long as he is obligated for her support.
8. The wife shall be responsible for all of the liabilities and expenses listed on her financial affidavit of April 3, 2001, with the exception of MENA America, the family dentist, Home Depot, and Gans and Reynolds. The husband shall be responsible for repayment of those debts (in the amounts listed on the wife's affidavit or the current debt level, whichever is less) within a reasonable time and shall provide the wife written verification of the same. Each shall indemnify and save harmless the other regarding his/her respective obligations. CT Page 5418
9. The husband shall be responsible for all of the liabilities and expenses listed on his financial affidavit of April 3, 2001, and he shall indemnify and save harmless the wife with regard to the same.
10. The husband shall be entitled to keep all of the assets of the business known as Ideal Plumbing and Heating Construction Company, Inc., free and clear of any claim by the wife and shall indemnify and save harmless her regarding the same.
11. The husband shall be entitled to keep whatever sums he may receive in repayment of personal loans made to family members, friends, or business associates during the course of the marriage — all to the exclusion of the wife and free of any claim by her.
12. The wife shall be entitled to keep the 1986 Ford Sundance and shall be responsible — to the exclusion of the husband — for all costs incident to her ownership of the car. She shall indemnify and save harmless the husband regarding the same.
13. The wife shall be entitled to keep the entirety of whatever recovery she may receive with regard to a personal injury claim she has brought for injuries and damages received in a car accident in the fall of 2000 — all to the exclusion of the husband.
14. The wife shall be entitled to keep all of the contents — to include the contents of safes therein found — located at the marital property with the exception of the following which shall be the property of the husband:
a. all of his personal clothing, footwear, and personal care items;
 b. all of his wrenches, power drills, and other tools used in his business;
c. the big screen television; and
d. the living room sofa.
 These items are to be removed within thirty (30) days of this date by arrangement with the wife, at which time the husband shall deliver to her whatever keys or lock combinations necessary to insure her access to the safes within the home.
15. The husband shall be responsible for his own attorney's fees.
SO ORDERED this 18th day of April, 2001. CT Page 5419
SHEEDY, J.